"COURT OF CRIMINAL APPEALS REVIEW"

# 674-16

ORIGINAL

## PETITION FOR DISCRETIONARY REVIEW
### TRIAL: 1428697 // APPEAL: 01-15-00274-CR

## TABLE OF CONTENTS

~ STATEMENT REGAURDING ORAL ARGUMENT
~ STATEMENT OF THE CASE
~ STATEMENT OF PROCEDURAL HISTORY
~ GROUNDS FOR REVIEW
~ ARGUMENT
~ PRAYER FOR RELIEF
~ APPENDIX

RECEIVED IN
COURT OF CRIMINAL APPEALS

FILED IN
COURT OF CRIMINAL APPEALS

JUN 17 2016

JUN 17 2016

Abel Acosta, Clerk

Abel Acosta, Clerk

## STATEMENT REGAURDING ORAL ARGUMENT

THE APPELANT/PETITIONER REQUEST ORAL ARGUMENT IN THIS CASE BECAUSE SUCH ARGUMENT MAY ASSIST THE COURT IN APPLYING THE FACTS TO THE ISSUES RAISED. IT IS SUGGESTED THAT ORAL ARGUMENT MAY HELP SIMPLIFY THE FACTS AND CLARIFY THE ISSUES, IF NECESSARY.

## STATEMENT OF THE CASE

IN CAUSE NUMBER 1428697 THE APPLICANT WAS CHARGED AND INDICTED FOR THE OFFENSE AGGRAVATED ASSAULT WITH A DEADLY WEAPON 7-14-2014 ; HARRIS COUNTY.

## STATEMENT OF PROCEDURAL HISTORY

IN CAUSE NUMBER 1428697 THE APPLICANT/PETITIONER WAS CHARGED WITH THE OFFENSE OF AGGRAVATED ASSAULT WITH A DEADLY WEAPON. THE APPLICANT WAS CONVICTED OF SUCH OFFENSE ON 2-18-2015 AND APPEALED THE CONVICTION ON 2-20-2015. FIRST DISTRICT COURT OF APPEALS UP HELD THE CONVICTION ON JUNE 2, 2016. NO MOTION FOR REHEARING WAS FILED. ON JUNE 10, 2016 THIS PETITION FOR DISCRETIONARY REVIEW WAS TIMELY MAILED TO THE COURT OF CRIMINAL APPEALS FOR FILING.

## GROUNDS FOR REVIEW

~ PROSECUTOR--FARNAZ FAIAZ STATES DURING TRIAL THE PHYSICAL EVIDENCE WAS NOT TESTED
~ SUBPOENA ID: 137161--OPEN AND OBSERVE GROUNDS FOR RELIEF OF EVIDENCE
~ HPD OFFICER OWENS INCOMPLETE POLICE REPORT IS NOT BASED ON OBSERVATIONS AT THE CRIME SCENE--WORD OF MOUTH TESTIMONY
~ 2 TESTIMONIES VERIFYING MY UNCONSCIOUS POSITION FRACTURES THE LOCATION OF THE "DISCOVERED EVIDENCE"--(HALF SCISSOR BLADE)
~ TRIAL LAWYER AND PROSECUTOR VIOLATED THE BRADY LAW NOT PRESENTING OR DISCLOSING
SUBPOENA FILE: 137161  SERVED: 1-8-2015  TIME: 3:36:00 PM

ARGUMENT >>>>>>

23

## ARGUMENT -- A, B, C, D (D= EXTRA PAGE)
### ~ TRANSCRIPTS ~

A ~ FROM THE TESTIFYING OFFICER, PROSECUTOR TO THE COMPLAINTANT. SOMEONES UNTRUTHFUL, OR ALL 3 : COMPLAINTANT TESTIFIES THAT WE WERE APPARENTLY BOTH INSIDE THE BATHROOM "FACING" THE WALL BETWEEN THE SINK AND THE DOOR WAY (ON THE BATHROOM FLOOR) ~HORIZONTALLY~. I WAS SAID TO BE STRADDLED ~STRADDLED~ ON TOP OF HER THUS MY KNEES TO HER WAIST, SHE EXPLAINS. IT WAS SAID ; AND DEMONSTRATED BY RYAN MCLEAREN AT TRIAL ; I ROLLED OVER AND PASSED OUT RESULTING ME TO END UP SO FAR IN THE "LIVING // DINNING" ROOM AREA THAT MY FEET ARE AT THE EDGE OF THE BATHROOM ENTRANCE (EXHIBIT 2). RYAN MCLEAREN DEMONSTRATED A SHORT "HORIZONTAL" ROLL THROUGH WHICH IS FIRSTLY IMPOSSIBLE TO GET ᴀ THIS SMALL BATHROOM DOOR WAY (WITHOUT TURNING VERTICLE). AND LOGICALLY ANY BODY COULDN'T HAVE ROLLED THAT FAR. "TUMBLE, FLIPPED OR FUMBLED", THIS COMPLAINTANT DID NOT "OBSERVE". IN THE CURRENCY OF THIS TESTIMONY HOW DID I END UP IN ANOTHER SECTION OF THE APARTMENT BY RYAN MCLEARENS AGREED ROLL DEMONSTRATION? (NOTE: RYAN'S ROLL ENDED ON HIS BACK) THIS FRACTURES THE POSITION OR "WHERE ABOUTS" OF THE DISCOVERED EVIDENCE (HALF SCISSOR BLADE). "FOUND NEXT TO ME". -- OFFICER OWENS STATES MY FEET WERE TOWARDS THE BATHROOM ~NOT INSIDE~ CID:3 COURT: 184 CASE: 1428697 01030

B ~ PLEASE OPEN SUBPOENA ID 137161, THAT PROSECUTOR FARNAZ FAIAZ STATED DOES NOT EXIST YET SENT TO HER WEB ADDRESS, EXECUTED (HCDistrict.clerk.com -- WITNESS LIST). I WAS INFORMED RECENTLY BY AN AGENT THAT THIS SUBPOENA FILE DOES WITH HOLD GROUNDS FOR RELIEF. DURING TRIAL 1428697 WAS A "BRADY ᴸᴬᵂ VIOLATION" ON PROSECUTORS AND LAWYERS BEHALF

C ~ OFFICER JEROME OWENS TESTIFIES HIS REPORT IS INCOMPLETE HAVING ONLY INFORMATION ABOUT THE COLLECTED EVIDENCE AND NOT HIS OBSERVATIONS OF THE CRIME SCENE (A BLANK) -- MEANING ITS LEFT BLANK // UNKNOWN TO COURT OFFICIALS ETC. IF I WAS FIT OR NOT TO GO TO EITHER JAIL OR THE HOSPITAL FOR EXAMINATION. -- BEING SOLEY DISCOVERED UNCONSCIOUS AND UNRESPONSIVE. OFFICER OWENS PRODUCES A WORD OF MOUTH ~EMS~ ETC. NOT TESTIMONY, HE COULD OF BEEN SAYING ANYTHING ON THE STAND. GENERALLY HE AGREES TO HIS REPORT NOR HFD ᴀ BEING IN THE SYSTEM CONCERNING OBSERVATIONS OF THE CRIME SCENE. -- TAKING MY VITALS -- UNCHECKED BLOOD NOR CONSUMPTION APPARENTLY -- JUST ARRESTED

## PRAYER FOR RELIEF

FOR THE REASONS STATED ABOVE, IT IS RESPECTFULLY SUBMITTED THAT THE COURT OF CRIMINAL APPEALS SHOULD GRANT THIS REVIEW. IF A DISCHARGE IS NOT AVAILIBLE, I ASK OF THE CRIMINAL APPEALS COURT TO REVERSE FIRST DISTRICT COURT OF APPEALS AND REMAND THE CASE BACK FOR A NEW APPELATE HEARING OR NEW TRIAL.

APPENDIX

FOLLOWING ATTACHMENT......

RESPECTFULLY SUBMITTED,
TUCKER, ERIC SAMUEL
1983465
STILES UNIT 3060 FM 3514
BEAUMONT, TX 77705
JUNE 10, 2016

~ MISLEADED CONCLUSION ~

D~ THE OVERALL SUMARY REVIEW OF TESTIMONIES, EXHIBITS, PHYSICAL EVIDENCE, CIRCUMSTANTIAL POSITION OF THE DEFENDANT, EVIDENCE AGAINST THE COMPLAINTANT, SUBPOENA FILES WERE MISLEAD BY PROSECUTION ETC. AND THOSE WHOM FOLLOWED PROSECUTION.

DUE TO LEFT OUT INFORMATION THE PIECES OF THIS CASE WERE PUT TOGETHER INAPPROPRIATELY GENERATING A MISCONSTRUED CONCLUSION (PROSECUTORS PRESENTATION ROUTE WAS A MISLEAD)

THE LEFT OUT LETTERS OF THE COMPLAINTANT ( LETTER PACKET ) DURING TRIAL VERIFYING :

~ SHE KNEW I WAS UNFAITHFUL AHEAD OF TIME, HAVING THE MATTERS IN HER DIARY

~ SHE INVADED MY CELL PHONE READING MY TEXT PROPOSING MARRIAGE TO ANOTHER WOMAN WHO RESPONDS YES

~ IN TRIAL EXHIBITS (AND PHONE RECORDS) SHE ADMITS VOODOO PRACTICE THUS THE FOLLOWING EXHIBITS VERIFIES VOODOOS NATURE OF POISON || DRUG INDUCING -- THEN THERES THE LETTER PACKETS LEFT OUT INFO ON VOODOO DESCRIBING SEVERE TO FATAL ACTIVITIES, ~ AND CONSUMPTIONS ~

WHY WASNT I HOSPITAL EVALUATED AND CHECKED THROUGH BLOOD ? THIS OFFENSE WAS SIMPLY STAGED OVER MY UNCONSCIOUSNESS. THE COMPLAINTANT KNEW THE SITUATION WOULD STALL ME BEING UNDER THE ASSUMPTION THAT I WAS POSSESSED, UNTIL 9-15-2014 - 9-16-2014. BEING STILL AND VERY EMOTIONALLY ATTACHED TO THE COMPLAINTANT; ACCUSING ME; IT WAS THE ONLY SENSE I COULD MAKE OF IT, FROM BEING SOLEY AWARE THAT I WAS UNCONSCOUS. LIES FROM THE COMPLAINTANT DID NOT SURFACE ; AS UNDERSTOOD ; TIL 9-15-2014 - 9-16-2014 PHONE CALLS, WHICH SURFACED MY SUSPICION. THEN EVERYTHING THE COMPLAINTANT HAD WRITTEN MADE COMMON SENSE SUCH AS :

### LETTER PACKET POINTERS

A - AFFIDAVIT (SIGNNED) : " IM AFRAID OF THE RESPONDENT "
B - LETTER : " SO YOU KNOW IM NOT AFRAID OF YOU "
A - TRIAL : " I WASNT IN LOVE, I ONLY HAD LOVE FOR HIM "
B - LETTER : " I WAS IN LOVE WITH YOU "
A - TRIAL : " SEX WAS VOLUNTARY "     NEVER HAPPENED -- UNCONSCIOUS
B - LETTER : " SEX WAS FORCED "     NEVER HAPPENED -- UNCONSCIOUS

* ASSUMPTION *

LETTER 1 : I WAS HURT FINDING OUT YOU WERE " #@!*?*@ " OTHER WOMEN AND DIDN'T USE PROTECTION PUTTING MY LIFE AT JEOPARDY

LETTER 2 : IM NOT SLOW OR STUPIT THATS THE 2ND BAG OF CONDOMS YOU WENT THROUGH

* RANDOM STATEMENTS -- MOTIVE *

" I KNEW (HAD A FEELING) YOU WERE CHEATING

RANDOM CONTINUE....>>>

20

>>> RANDOM

"IN MY DIARY I PUT THINGS IN THERE ABOUT YOUR UNFAITHFULNESS"

"I WAS HURT THAT YOU WERE SLEEPING WITH OTHER WOMEN"

"YOU MESSED OVER THE WRONG ONE"

"EYE FOR AN EYE"

"I TOLD YOU FROM THE BEGINNING NEVER LIE, CHEAT, OR DECEIVE ME AND BE 100% BUT YOU COULDNT SO YOU PLAYED ME LIKE A FOOL, HOW DOES IT FEEL NOW"

"SOMEBODY HAS TO BE ACCANABLE"

"DONT TAKE IT PERSONAL"

"I BELIEVE YOU ARE A LIAR AND NOT SO (SOME) MUCH INNOCENT"

"I HAVE ALWAYS STATED I DONT LIKE TO BE PLAYED FOR A FOOL"

"HEY THOT" (THAT HOE OVER THERE)

"YOUR FAVORITE DRINK DELSYM"

"ASKING ANOTHER B#!6* TO MARRY YOU"

NOTE:

DURING MY ASSUMPTION OF POSSESSION SHE FREELY EXPLAINS HER VOODOO HAD NOTHING TO DO WITH ME (TRANSCRIPTS), YET I DISCLOSE TO HER WHAT VOODOO CONSIST OF, SHE THEN PUSHES INVOLVEMENT BACK 3 YEARS AGO, THEN ~BEFORE HER EX OF 6YR~ 9 YEARS IN TOTAL, OVER THE PHONE. AT TRIAL SHE COMPLETELY DENIES THE PRACTICE SAYING WHAT SHE HAS ARE MARDI GRASS ITEMS. SHE DIDNT EXPECT ME TO KNOW ABOUT IT....

NOTE 2:

PROSECUTION CLAIMS IVE JUMPED FROM ONE CONCLUSION TO THE NEXT WHEN IT WAS MERE ASSUMPTION THAT REVEALED MERE FACTS. MY LETTERS (ALL) WERE THROUGH THE ASSUMPTION THAT I WAS POSSESSED ETC., WHEN I WAS ACTUALLY BEING DRUG/POISON INDUCED THEN FRAMED; GENERATING FROM THIS UNTRUTHFUL VOODOO PRACTIONER COMPLAINTANT -- **THIS IS THE LINK TO MY BEHAVIOR AND UNCONSCIOUSNESS**

NOTE 3: "???"

IN VIEWING TRANSCRIPTS IT WAS ESTABLISHED BY THE PROSECUTOR AND COMPLAINTANT THAT THIS OFFENSE TOOK PLACE ON A THURSDAY, DUE TO MY UNCONSCIOUSNESS; UNAWARE OF WHAT TOOK PLACE; MY ARREST DATE WAS 5-15-2014 ON A FRIDAY, AS DISCOVERED UNCONSCIOUS AND UNRESPONSIVE. IF THE OFFENSE WAS ON A THURSDAY I WAS NEVER THERE DURING THIS OFFENSE. ~ TRANSCRIPT REVIEW RECOMMENDED ~

NOTE 4:

COMPLAINTANT AGREES TO TRIAL LAWYERS QUESTION OF "I KIND OF ROLLED OVER AND PASSED OUT"... ~ TRANSCRIPTS ~

RESPECTFULLY SUBMITTED,
TUCKER, ERIC S. 1983465
STILES 3060 FM 3514
BEAUMONT, TX 77705
JUNE 10, 2016

Opinion issued June 2, 2016



In The

# Court of Appeals

For The

# First District of Texas

———————————

## NO. 01-15-00274-CR

———————————

### ERIC SAMUEL TUCKER, Appellant

### V.

### THE STATE OF TEXAS, Appellee

———————————

### On Appeal from the 184th District Court
### Harris County, Texas
### Trial Court Case No. 1428697

———————————

## MEMORANDUM OPINION

The trial court found appellant, Eric Samuel Tucker, guilty of the offense of

aggravated assault of a family member[1] and assessed his punishment at

---

[1]    See TEX. PENAL CODE ANN. § 22.02(b)(1) (Vernon 2011); see also TEX. FAM. CODE ANN. § 71.0021(b) (Vernon Supp. 2015).

confinement for thirty years. It further found that he used or exhibited a deadly weapon, namely, scissors, in the commission of the offense. In his sole issue, appellant contends that the evidence is legally insufficient to support his conviction.

We affirm.

## Background

The complainant, Kimberly Lockett, testified that on the night of May 14, 2014, while she was asleep in her bed, appellant, who was her boyfriend, broke through the front door of her apartment. Although he lived with her and normally carried a key, he had been out of town earlier that day, and she, not expecting him to return that night, had engaged the deadbolt lock on the front door. When the complainant heard appellant forcing his way into the apartment, she got up to investigate. After she saw that the door frame was damaged, she argued with him, and he promised to make repairs.

When the complainant returned home from work the next evening, she found appellant at her apartment, attempting to repair the door frame. She also saw that he was smoking synthetic marijuana, which he typically mixed with "herbals" and "cough syrup." The complainant again argued with appellant about the damage to the door. However, after he apologized and gave her money to have the door repaired, she dropped the matter.

2

Later that evening, while the complainant was sitting on a couch in her living room, appellant got up to go to a gym. After "messing around in his bag," he, without provocation, reached out and scratched her chest with a "pill wrapper." He then "punched" her face, breaking her glasses. Appellant told the complainant that his actions were in retribution for an occasion two months prior, when she had scratched and hit him while they were "horseplaying around." After she told him to leave her apartment, she went into the bathroom to examine her injuries.

As the complainant walked into her bedroom, she picked up her telephone and told appellant that if he did not leave, she was going to "call the cops." He then "race[d]" into the bedroom, took her telephone from her, placed her "in a chokehold," "pushed [her] onto the bed" from behind, "tried to sexually assault [her]," and "proceeded to get on top of [her]." When the complainant told appellant that she needed to "throw up," he released her, and she ran into the bathroom.

Appellant followed the complainant into the bathroom, put her "in a chokehold again," and dragged her back to the bed. She pleaded with him to "let [her] go," and they began "wrestling," meaning that she was "trying to fight him to get off of her." Again, she told him that she needed to "throw up," and he released her. However, appellant followed the complainant to the bathroom once again and "start[ed] to put her in a chokehold," but they "fell to the floor." He then held her

3

down and "tried to sexually assault [her] again." After he was unsuccessful, he "backed up and pulled her up by her hair" into the hallway. Appellant then pulled the complainant back into the bathroom, pushed her head into the toilet, and told her to "throw up." While she was on her knees and screaming for help, he pushed her down against the toilet. She then saw that he had scissors and "was cutting her hair." And he attempted to "feed" her hair "into [her] mouth."

Appellant then "pull[ed]" the complainant's earrings out and "start[ed] to cut" her ear with the scissors. She saw "blood dripping" as she was screaming, "fighting, and trying to stop him." But "he pull[ed] some more" and "cut again." When appellant "attempted to go for [her] other ear," the complainant turned her head and felt her ear "flap against [her] cheek." As he began to cut her other ear, she was able to get to her feet. He then fractured her thumb while she struggled to pull the scissors away from him.

Appellant and the complainant again fell to the floor, where he "[got] on top of [her]" and "straddle[d]" her. He held one hand "on [her] throat" and tried to "stuff the other one" into her mouth to "keep [her] from screaming." She bit his finger and "swipe[d]" him with her "left hand across his face." He then "hit [her] with a couple of blows to the face" with his fist. Appellant then "[took] the scissors" and stabbed the complainant's left wrist. He "jog[ged]" the scissors into her arm, "then he start[ed] to dig and move [them] around." She screamed until,

4

"all of the sudden, [she] stopped feeling the pain." Appellant then "start[ed] to make a growling sound" and began "shaking his head like [he was] in a biting situation." He then "roll[ed] over and passe[d] out." The complainant did not move for several seconds "to see if anything was going to happen." She then went to a neighbor's apartment for help.

The complainant further testified that after appellant's attack, she was hospitalized for a week; required two surgeries; and suffered muscle and nerve damage to her wrist, which remained numb thereafter. She noted that on the night of the assault, appellant had been smoking synthetic marijuana that he had "lac[ed]" with "herbals" and "cough medicine." She explained that he spoke to her throughout portions of the assault and seemed coherent. And the complainant opined that appellant knew what he was doing. When she wrote to him after the assault to ask why he had attacked her, he responded that he was "under some type of voodoo or transpiritual [sic] possession." The trial court admitted into evidence several letters that appellant wrote to the complainant after the assault.

Houston Police Department Officer J. Owens testified that on May 15, 2014, he was dispatched to the complainant's apartment to investigate an aggravated assault. At the apartment, he found appellant lying "facedown" on the floor with a single scissor blade next to his right hand. At first, appellant was "not responsive." However, he later became responsive to emergency medical personnel, who sat

him up. Appellant then spoke and gave coherent answers to their questions. After the trial court admitted the scissor blade into evidence, Owens testified that based on his experience and training, the scissor blade in this case was used as deadly weapon. He noted that emergency medical personnel transported the complainant to a hospital for treatment.

Dr. Rodger Brown testified that he was the attending plastic surgeon on call at the hospital to which the complainant was taken on May 15, 2014. He noted that she had suffered "significant blood loss" and her injuries "necessitated emergency operations" and "blood transfusions." She had multiple injuries to her head, neck, chest, and forearm. And the complainant had "almost a complete amputation of her thumb," which he described as "a laceration almost all the way around" it, exposing a fracture. A "vein graft" was required to repair the damaged tissue on her thumb. Brown opined that the tissue damage was consistent with having been bitten by a human being. He further noted that on the complainant's forearm was a "sharp laceration," consistent with having been cut by "a knife or scissors." She had also suffered a "laceration" to "one of the major arteries of [her] forearm" and a "complete laceration of both major nerves to the hand. He noted that "multiple tendons . . . were cut to the index, middle, ring, and small finger." Brown opined that, without medical intervention, the complainant would not have any function in her hand, and, even after the intervention, she is "not

6

likely" to ever regain full movement of her hand. He noted that another doctor had treated the wounds to the complainant's ears.

Appellant testified that when he arrived at the complainant's apartment the night before the assault, "it sounded like somebody was inside" and he "became overwhelmed with jealousy." He "figured he could fix" the front door, so he "pushed it open." And he and the complainant then "had it out" and resolved matters. The next day, when she arrived home from work, they talked about the door, he told her that he would repair it, and they "made up." "[T]hroughout the day," he had been smoking synthetic marijuana "laced with cough syrup." And, when he was "getting ready to leave," he felt dizzy and sat down. Then, "all of the sudden, [he] woke up in [a] police car." Appellant opined that the complainant had inflicted the injuries on herself and "[m]ade this whole theatrical thing up" because she was jealous that he had been cheating on her.

## Standard of Review

We review the legal sufficiency of the evidence by considering all of the evidence in the light most favorable to the trial court's judgment to determine whether any rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 318–19, 99 S. Ct. 2781, 2788–89 (1979); *Williams v. State*, 235 S.W.3d 742, 750 (Tex. Crim. App. 2007). Our role is that of a due process safeguard, ensuring only the

7

rationality of the trier of fact's finding of the essential elements of the offense beyond a reasonable doubt. *See Moreno v. State*, 755 S.W.2d 866, 867 (Tex. Crim. App. 1988). We give deference to the responsibility of the fact finder to fairly resolve conflicts in testimony, weigh evidence, and draw reasonable inferences from the facts. *Williams*, 235 S.W.3d at 750. However, our duty requires us to "ensure that the evidence presented actually supports a conclusion that the defendant committed" the criminal offense of which he is accused. *Id.*

### Sufficiency of the Evidence

In his sole issue, appellant argues that the evidence is legally insufficient to support his conviction because he lacked the requisite mental state to commit the offense and his conduct was not voluntary. He asserts that he was "under the influence of synthetic marijuana," was "in a blackout state," and "does not recall any of the alleged assault."

A person commits an assault if he "intentionally, knowingly, or recklessly causes bodily injury to another." TEX. PENAL CODE ANN. § 22.01(a)(1) (Vernon Supp. 2015). A person commits the offense of aggravated assault if he commits assault, as defined in section 22.01, and he "causes serious bodily injury to another." *Id.* § 22.02(a)(1) (Vernon 2011). As applicable here, a person commits the first-degree-felony offense of aggravated assault of a family member if he uses a deadly weapon during the commission of the assault and causes serious bodily

8

injury to a person with whom he is in a "dating relationship." *Id.* § 22.02(b)(1); *see* TEX. FAM. CODE ANN. § 71.0021(b) (Vernon Supp. 2015); *Blea v. State*, 483 S.W.3d 29, 33–35 (Tex. Crim. App. 2016).

"'Bodily injury' means physical pain, illness, or any impairment of physical condition." TEX. PENAL CODE ANN. § 1.07(a)(8) (Vernon Supp. 2015). And "[s]erious bodily injury" means "bodily injury that creates a substantial risk of death or that causes death, serious permanent disfigurement, or protracted loss or impairment of the function of any bodily member or organ." *Id.* § 1.07(a)(46). The relevant issue is the disfiguring effect of the bodily injury as it was inflicted, not after the effects had been ameliorated by other actions such as medical treatment. *Stuhler v. State*, 218 S.W.3d 706, 714 (Tex. Crim. App. 2007).

A person acts intentionally with respect to the nature of his conduct or a result of his conduct when it is his conscious objective or desire to engage in the conduct or cause the result. TEX. PENAL CODE ANN. § 6.03(a) (Vernon 2011). A person acts knowingly with respect to a result of his conduct when he is aware that his conduct is reasonably certain to cause the result. *Id.* § 6.03(b). Proof of a mental state almost always depends upon circumstantial evidence. *Smith v. State*, 56 S.W.3d 739, 745 (Tex. App.—Houston [14th Dist.] 2001, pet. ref'd). A fact finder may infer intent or knowledge from any facts that tend to prove its existence, including the acts, words, conduct of the accused, and the method of

9

committing the offense. *Guevara v. State*, 152 S.W.3d 45, 50 (Tex. Crim. App. 2004); *Hart v. State*, 89 S.W.3d 61, 64 (Tex. Crim. App. 2002).

"[T]he issue of the voluntariness of one's conduct . . . is separate from the issue of one's mental state." *Rogers v. State*, 105 S.W.3d 630, 638 (Tex. Crim. App. 2003) (internal quotations omitted); *see Whatley v. State,* 445 S.W.3d 159, 166 (Tex. Crim. App. 2014) (voluntariness issue "distinct inquiry from the knowing or intentional *mens rea* requirement"); *see also* TEX. PENAL CODE ANN. § 6.01 (Vernon 2011) (voluntary act); *id.* § 6.02 (Vernon 2011) (culpable mental state); *Ramirez–Memije v. State*, 444 S.W.3d 624, 627 (Tex. Crim. App. 2014) ("The general requirements for an offense to have been committed are an actus reus and a mens rea."). "A person commits an offense only if he voluntarily engages in conduct, including an act, an omission, or possession." TEX. PENAL CODE ANN. § 6.01(a). The concept of voluntariness refers to a person's physical body movements, which must be the product of his will, not of a "physical reflex or convulsion," nor of "unconsciousness, hypnosis, or other nonvolitional impetus." *Whatley*, 445 S.W.3d at 166 (quoting *Rogers*, 105 S.W.3d at 638).

Here, the complainant testified in detail about the lengthy attack on her by appellant, who was then her boyfriend. He began the assault when she told him to leave her apartment and picked up her telephone to call for emergency assistance. Appellant "race[d]" into her bedroom; took her telephone from her; placed her into

10

a series of "chokehold[s]"; "pushed" her; "dragged" her; "straddle[d]" her; held one hand "on [her] throat" and tried to "stuff the other one" into her mouth to "keep [her] from screaming"; punched her face with his fist; tried to push her head into a toilet; cut her hair; and attempted to "feed" her hair "into [her] mouth." He ignored her pleas to be released, wrestled with her when she tried to "fight him to get off of her," and resisted her with such force that he fractured her thumb.

Appellant "pull[ed]" out the complainant's earrings and "cut" her ear with scissors. As she was screaming, "fighting, and trying to stop him," "he pull[ed] some more" and "cut again." He cut her so severely that when "he attempted to go for [her] other ear" and she turned her head, she felt her ear "flap against [her] cheek." Appellant then used the scissors to cut into the complainant's left wrist and "start[ed] to dig and move [them] around." She screamed until, "all of the sudden, [she] "stopped feeling the pain." The complainant noted that appellant spoke to her throughout portions of the assault and was coherent. And she opined that although he was "not in his right mind," he knew what he was doing. For instance, each time that she told him that she needed to "throw up," he released her. And, later, when he pushed her head into the toilet, he told her to "throw up."

Dr. Brown testified that the complainant's injuries "necessitated emergency operations" and "blood transfusions." The injuries to her forearm, consistent with having been cut by "a knife or scissors," included a "laceration" to "one of the

11

major arteries of [her] forearm" and a "complete laceration of both major nerves to the hand." "[M]ultiple tendons . . . were cut to the index, middle, ring, and small finger." Brown opined that the complainant is "not likely" to ever regain full movement of her hand. *See* TEX. PENAL CODE ANN. § 1.07(a)(46) ("[s]erious bodily injury" includes "serious permanent disfigurement" or "protracted loss or impairment of the function of any bodily member").

From the evidence, the trial court, as fact finder, could have reasonably found that appellant acted with intent to cause serious bodily injury, or acted with reasonable certainty that serious bodily harm would result, when he cut the complainant's forearm with scissors. *See id.* § 6.03; *Hart*, 89 S.W.3d at 64 (mental state may be inferred from any facts tending to prove its existence, including acts, words, and conduct of accused); *Herrera v. State*, 367 S.W.3d 762, 771 (Tex. App.—Houston [14th Dist.] 2012, no pet.) (intent may be inferred from extent of injuries to complainant and "method used to produce the injuries"); *Grant v. State*, 247 S.W.3d 360, 364, 369 (Tex. App.—Austin 2008, pet. ref'd) (evidence defendant hit complainant in face, breaking her jaw, "grabbed her around her neck," and stabbed her chin with cuticle scissors legally sufficient to support conviction for aggravated assault with serious bodily injury); *see, e.g., Castillo v. State*, No. 05-01-01725-CR, 2003 WL 42405, at *2 (Tex. App.—Dallas Jan. 7, 2003, pet. ref'd) (not designated for publication) (evidence defendant bit off

12

portion of complainant's finger, which could not be reattached, legally sufficient to support conviction for aggravated assault causing serious bodily injury).

Appellant argues that the evidence is legally insufficient to prove that the aggravated assault "included any voluntary act" because it "showed that [his] movement was the 'product of unconsciousness.'" He asserts that he was "under the influence" of a "bad batch" of "synthetic marijuana" that he had "rolled in cough syrup," causing "unanticipated side effects." And he "blacked out and [did] not recall any of the alleged assault."

However, nothing in the evidence described above suggests that appellant's acts were "the nonvolitional result of someone else's act, [were] set in motion by some independent non-human force, [were] caused by a physical reflex or convulsion, or [were] the product of unconsciousness, hypnosis or other nonvolitional impetus." *See Farmer v. State*, 411 S.W.3d 901, 907 (Tex. Crim. App. 2013) ("All that is necessary to satisfy [s]ection 6.01(a) of the Texas Penal Code is that the commission of the offense *include*[] a voluntary act.").

In support of his argument, appellant relies on *Farmer*. In *Farmer*, the defendant, who was charged with the offense of driving while intoxicated, attempted to assert an involuntary-intoxication defense, arguing that he had not voluntarily consumed the intoxicating substance at issue, namely, a sleeping pill. 411 S.W.3d at 902, 904. Although he took prescription medications daily, he had,

13

on the day of the incident, accidentally taken the sleeping pill. *Id.* at 902. The court rejected the defendant's voluntariness issue, concluding that there was no evidence of an intoxicant other than the one that the defendant had voluntarily consumed. *Id.* at 907.

The record before us shows that "[t]hroughout the day" of the assault, appellant voluntarily smoked synthetic marijuana, which he had "rolled in cough syrup." And he testified that he chose to do so because of its intoxicating effects. "Voluntary intoxication does not constitute a defense to the commission of crime." TEX. PENAL CODE ANN. § 8.04 (Vernon 2011); *see Farmer*, 411 S.W.3d at 907; *Witherspoon v. State*, 671 S.W.2d 143, 144 (Tex. App.—Houston [1st Dist.] 1984, pet. ref'd). Thus, even if the synthetic marijuana caused "unanticipated side effects" or appellant was "in a blackout state induced by smoking [it]" and "could not recall" the assault, these facts would not negate the evidence of his guilt. *See, e.g.*, *Broadnax v. State*, No. AP-76,207, 2011 WL 6225399, at *14 (Tex. Crim. App. Dec. 14, 2011) (not designated for publication) (evidence defendant "high on PCP" at time of offense did not negate evidence of guilt); *Natividad v. State*, No. 10-15-00155-CR, 2016 WL 102785, at *2 (Tex. App.—Waco Jan. 7, 2016, no pet.) (mem. op., not designated for publication) (evidence defendant "had no memory of what she did or what happened on the date in question because she was taking Ambien" did not render acts in committing aggravated assault

14

nonvolitional). Further, to the degree that appellant asserts otherwise, evidence of voluntary intoxication "does not negate elements of intent or knowledge." *See Witherspoon*, 671 S.W.2d at 144.

Viewing all of the evidence in the light most favorable to the trial court's finding of guilt, we conclude that a rational trier of fact could have reasonably found that appellant intentionally or knowingly caused serious bodily injury to the complainant and that his actions were voluntary. *See* TEX. PENAL CODE ANN. §§ 6.01, 22.02(b)(1). Accordingly, we hold that the evidence is legally sufficient to support appellant's conviction for the offense of aggravated assault of a family member. *See id.* § 22.02(b)(1); *see also* TEX. FAM. CODE ANN. § 71.0021(b).

We overrule appellant's sole issue.

### Conclusion

We affirm the judgment of the trial court.


Terry Jennings
Justice

Panel consists of Justices Jennings, Massengale, and Huddle.

Do not publish. TEX. R. APP. P. 47.2(b).

TUCKER, ERIC S.
#1833465
STILES UNIT
BEAUMONT, TX 3060 FM 3514
77705

* LEGAL MAIL *

~ CLERK ~
COURT OF CRIMINAL APPEALS
OF TEXAS
PO BOX 12308,
CAPITOL STATION,
AUSTIN, TX 78711

* LEGAL MAIL *

FOREVER USA